**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

MAY 0 6 2019

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

2:19-.cv-00051 DPm /JTK

| | | |
|---|---|---|
| JERRY SMITH, | § | |
| (SPN # 29176-001), | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | Civil No. ___:19-cv-_____ |
| | § | Crim No. 3:11-cr-00283-SLB-HGD-1 |
| DEWAYNE HENDRIX, Warden, | § | |
| FCI Forrest City Low, | § | |
| Respondent. | § | |

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

COMES Petitioner, JERRY SMITH ("Smith"), appearing *pro se,* and in support of this memorandum would show as follows:

## I. STATEMENT OF JURISDICTION

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 2241, which confers jurisdiction on district courts to issue writs of habeas corpus in response to a petition from a state or federal prisoner who "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. 2241(a) and (c)(3). A petition for habeas corpus under 28 U.S.C. § 2241 must be filed in the district of confinement. A federal prisoner may also challenge the legality of his detention under § 2241 if he falls within the "savings clause" of § 2255(e). See *Poor Thunder v. United States,* 810 F.2d 817, 822-23 (8th Cir.1987).

## II. <u>STATEMENT OF THE GROUND FOR REVIEW</u>

Whether, Smith's Conviction is Unconstitutional Because He is Actually Innocent.

## III. <u>STATEMENT OF THE CASE</u>

### A. <u>Procedural Background</u>

On July 26, 2011, a grand jury sitting in the United States District Court for the Northern District of Alabama, Northwestern Division, returned a six (6) count Indictment charging Smith. See Doc. 1.[1] Counts 1-6 charged Smith with Transportation of a Minor in Interstate Commerce for Purpose of Engaging in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(a). *Id.*

On October 5, 2011, a Change of Plea Hearing was held and Smith entered a guilty plea as to Counts 2, 3, and 4 of the Indictment, pursuant to a written Plea Agreement. See Doc. 21.

On March 22, 2012, Smith was sentenced to a total term of 120 months' Imprisonment, 10 years Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $300. See Doc. 29.

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Northern District of Alabama, Northwestern Division in Criminal No. 4:14-cr-00124-SWW-1, which is followed by the Docket Entry Number. "CvDoc." refers to the Docket Report in the United States District Court for the Northern District of Alabama, Northwestern Division in Civil No. 3:13-cv-08002-SLB, which is followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

On February 7, 2013, Smith filed a Motion under 28 U.S.C. § 2255 to Vacate,

Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). See

CvDoc. 1.

On December 23, 2014, the Court issued an Order denying Smith's § 2255

Motion. See CvDoc. 26.

### B.   Statement of the Facts

1.   Offense Conduct

Smith, through the advise of his attorney, agreed to the following factual basis

for the plea:

> The victim in this case is C.P.A., DOB XX/XX/1995, residing in Red
> Bay, Alabama, which is in Franklin County. C.P.A. has known Jerry
> Smith her entire life, since he was friends with her birth father. Smith
> lives less than a mile from C.P.A.'s house. C.P.A. has dated his eighteen
> year old son in the past. Smith was employed as a long haul truck driver
> at the time of these crimes. Smith's DOB is XX/XX/1970.
>
> In December 2010, C.P.A. accompanied Smith on a work-related trip to
> Texas. Smith asked C.P.A.'s mother if she objected. C.P.A.'s mother did
> not object since Smith promised her he would treat C.P.A. as he would
> his own child and that they could "trust him." The trip to Texas was
> three days and according to C.P.A. was uneventful. C.P.A. and Smith
> both slept in the sleeper compartment of the truck but under separate
> blankets.
>
> Shortly after this trip, Smith and C.P.A. began texting each other. The
> texts became very frequent and were sexual in nature. C.P.A. believed
> the texts were sent by Smith in an attempt to determine whether or not
> C.P.A. would have sex with him.

On January 17, 2011, C.P.A. accompanied Smith on a trip to Indiana. On the way there, C.P.A. asked Smith to stop at a rest stop outside of Nashville, Tennessee, so that she could use the rest room. It was at this rest stop that they had sex in his truck. After the trip resumed, they stopped at another rest stop in Tennessee, just before the Kentucky state line. They had sex again during this stop. They did not stop in Kentucky but stopped in Indiana, just prior to arrival at their destination in Indianapolis. They had sex for a third time at this location. After driving back to Alabama, Smith dropped C.P.A. off at her home at midnight. Smith did not buy condoms during this trip because he already had some in the truck, however, he did use condoms during the above-described sex acts.

The age of consent in Indiana is 16. The age of consent in Tennessee is 18.

See Doc. 21 at 2-4.

### 2.   Plea Proceeding

On October 5, 2011, a Change of Plea Hearing was held before Chief Judge Sharon Lovelace Blackburn. Smith entered a guilty plea as to Counts 2, 3, and 4 of the Indictment, pursuant to a written Plea Agreement. See Doc. 21. In exchange for Smith's guilty plea, the government agreed to: (1) move to dismiss Counts 1, 5, and 6 at the time of sentencing; (2) recommend that Smith receive an appropriate reduction for acceptance of responsibility; (3) and that Smith be sentenced for a term consistent with the low end of the advisory guideline range. *Id.* at 4. The case was referred to the Probation Office for the preparation of the PSR.

3.    Presentence Report Calculations and Recommendations

The November 1, 2011 edition of the Guidelines Manual was used in this case, pursuant to USSG § 1B1.11. See PSR ¶ 19. The PSR grouped Smith's offenses as follows: Group 1 - Count 2; Group 2 - Count 3; and Group 3 - Count 4. On each group, the PSR recommended a Base Offense Level 28, pursuant to USSG § 2G1.3(a)(3). See PSR ¶¶ 21, 29, 37. Two (2) level were added because the minor was otherwise in the custody, care, or, supervisory control of Smith, pursuant to USSG § 2G1.3(b)(1)(A). See PSR ¶¶ 22, 30, 38. Two (2) levels were added because Smith unduly influenced the minor to engage in prohibited sexual conduct, pursuant to USSG § 2G1.3(b)(2)(B). See PSR ¶¶ 23, 31, 39. Another two (2) levels were added because the offense involved the commission of a sex act, pursuant to USSG § 2G1.3(b)(4)(A). See PSR ¶¶ 24, 32, 40. The Adjusted Offense Level was computed to be level 34, plus a three (3) level increase for the total number units corresponding to Groups 1-3, which totalled to a Combined Adjusted Offense Level of 37, pursuant to USSG § 3D1.4. See PSR ¶¶ 44-51. However, Smith received a 5-level enhancement, pursuant to USSG § 4B1.5(b) (Repeat and Dangerous Sex Offender Against Minors), establishing a Total Enhanced Offense Level of 42. See PSR ¶¶ 52-53. Smith received a three (3) level reduction for acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) and (b). See PSR ¶¶ 54-55. The PSR calculated Smith

Total Offense Level to be level 39. See PSR ¶ 56. Smith's criminal history points is 0, placing him in Criminal History Category I. See PSR ¶ 59. Based on a Total Offense Level of 39 and a Criminal History Category of I, the guideline range for imprisonment is 262 to 327 months. See PSR ¶ 83.

Counsel has objected to the PSR, and submits the accurate Offense Level is 29. This would yield a sentencing range of 87 - 108 months. Further, counsel moved the Court to impose a significant sentence of 120 months of incarceration to be followed by a lifetime term of sexual offender registration, in that such a sentence will be sufficient but not greater than necessary to accomplish the purposes of sentencing. See Doc. 25.

### 4.   Sentencing Proceeding

On April 6, 2012, a Sentencing Hearing was held before Chief Judge Sharon Lovelace Blackburn. At sentencing, Smith raised his Objections to the PSR as follows: (1) Counts 2 and 4 should be grouped - sustained; (2) 2-point enhancement for the minor being otherwise in custody of supervisory control of Smith - overruled; (3) 2-point enhancement for unduly influencing a minor to engage in prohibited sexual conduct - sustained; and (4) 5-level enhancement under USSG § 4B1.5(b) - sustained, that gives an Adjusted Offense Level of 32. See Doc. 31. Smith received a 3-level reduction for acceptance of responsibility, bringing Smith's Total Offense

Level to 29, in Criminal History Category I, yielding a guideline imprisonment range of 87 to 108 months. However, the statutory minimum for the crimes that Smith pled guilty to is 120 months. *Id.* at 18. Having ruled on objections, the Court adopted the factual statement contained in the PSR and sentenced Smith to a mandatory minimum sentence of 120 months. No direct appeal was filed in this case.

     5.    <u>Postconviction Proceeding</u>

On February 7, 2013, Smith filed a § 2255 Motion [CvDoc. 1] and submitted an Amended Memorandum supporting the Motion on January 1, 2014, alleging that counsel was ineffective for three reasons: (1) for failing to appeal petitioner's case after being requested to do so by petitioner; (2) for coercing petitioner into pleading guilty to a crime he did not commit; and (3) for refusing to seek a withdrawal of petitioner's guilty plea [CvDoc. 6 at 2-4]. Smith also argued that the victim's recantation in an affidavit, attached as an exhibit to petitioner's Amended Memorandum, proved that the victim's previous testimony regarding petitioner's criminal conduct was false, and thus, placed petitioner's conviction into question. *Id.* at 5-6, 9. However, the Court opined that the victim's recantation testimony was not credible, therefore, Smith's § 2255 Motion was denied (as to all claims) on December 23, 2014. See CvDocs. 25, 26.

## IV. COGNIZABLE CLAIMS IN A PETITION FOR
## WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

A federal prisoner may attack the validity of his conviction in a § 2241 petition if he can meet the requirements of § 2255(e)'s savings clause. See *U.S. v. Lurie*, 207 F.3d 1075 (8th Cir. 1999). The prisoner bears the burden of showing that the remedy under § 2255 would be "inadequate or ineffective to test the legality of his detention." § 2255(e); *Crawford v. Minnesota*, 698 F.3d 1086 (8th Cir. 2012). A petitioner's inability to meet the procedural requirements of § 2255 is insufficient to meet this burden. See *Abdullah v. Hedrick*, 392 F.3d 957, 959 (8th Cir.2004). Rather, a prisoner who wishes to proceed under the savings clause must establish that his claim "is based on a retroactively applicable Supreme Court decision which establishes that the petitioner may have been convicted of a nonexistent offense" and that the claim "was foreclosed by circuit law at the time when the claim should have been raised." *Reyes-Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001). A petition for habeas corpus under 28 U.S.C. § 2241 must be filed in the district of confinement. See *McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013). This Court has jurisdiction to hear a habeas corpus petition under 28 U.S.C. § 2241 because it is the closest U. S. District Court to where Smith is incarcerated.

Smith is unable to return to an Alabama forum for relief based on the evidence

in this second federal application. The Alabama Court has ruled that Smith's evidence

of innocence based on the victim's affidavit dated September 27, 2013 (recantation

testimony). As the court finds that the victim's recantation testimony not credible,

Smith's § 2255 Motion was denied on December 23, 2014. See CvDoc. 26. However,

there is no question that Smith's proof meets the threshold or "gateway" that the

Supreme Court established in *Schlup v. Delo*, 513 U.S. 298 (1995).

In *Schlup*, the Court held that prisoners asserting innocence as a gateway to

defaulted claims must establish that, in light of new evidence, "it is more likely than

not that no reasonable juror would have found petitioner guilty beyond a reasonable

doubt." *House v. Bell*, 547 U.S. 518 (2006) (citing 513 U.S. at 327). This formulation

"ensures that petitioner's case is truly 'extraordinary', while still providing petitioner

a meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey

v. Zant*, 499 U.S. 467, 494 (1991)). A petition supported by a convincing *Schlup*

gateway showing "raise[s] sufficient doubt about [the petitioner's] guilt to undermine

confidence in the result of the trial without the assurance that that trial was untainted

by constitutional error"; hence, "a review of the merits of the constitutional claims"

is justified. *Id.* (quoting, *Schlup*, 513 U.S., at 317).

In determining whether a Petitioner has passed through *Schlup*'s gateway, the court may consider "new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial," *id.*, at 324. However, the habeas court's analysis is not limited to such evidence. *Schlup* makes plain that the habeas court must consider " 'all the evidence,' " old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." See *id.*, at 327-328, 115 S.Ct. 851 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)). Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." 513 U.S., at 329.

While "the court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors," *id.*, the gateway actual-innocence standard is not equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), which governs claims of insufficient evidence. *House*, 547 U.S. at 519. When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict. Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the

federal court to assess how reasonable jurors would react to the overall, newly supplemented record. See *id*. If new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial." *Id*.; see also *ibid*. (noting that "[i]n such a case, the habeas court may have to make some credibility assessments").

## V. <u>DISCUSSION</u>

As a preliminary matter, Smith respectfully requests that the Court be mindful that "a *pro se* complaint should be given liberal construction, we mean that if the essence of an allegation is discernible ... then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." See *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

### <u>Smith's Conviction is Unconstitutional Because He is Actually Innocent.</u>

The evidence that Smith would present to meet *Schlup*'s gateway is truly extraordinary, consisting of letters from Dallas Thorn, Deborah Wooten, Danielle M. Jones, Polly McLees, and Trisha Johnson, all expressing the same thought that the Victim–C.P.A. is sorry for all the lies she told about Jerry Smith. The factual basis of their statements is uncontestable, and coherent with each other's statement.

Under *Schlup* this Court cannot review the evidence in a light most favorable to the verdict (guilty plea). It must reassess the probative value of the government's already "weak and tentative" evidence in comparison to the confession proof that C.P.A. told numerous people. The government's case, when exposed to this evidence under an evenhanded light, simply melts away.

Close review of the decision in *Herrera v. Collins*, 506 U.S. 39 (1993), demonstrates that a majority of the Court found that the execution of an innocent man violates the constitution. *Id*. at 419 (O'Connor, J., joined by Kennedy, J., concurring) ("executing the innocent is inconsistent with the Constitution"); *Id*. (O'Connor, J., joined by Kennedy, J., concurring) ("the execution of a legally and factually innocent person would be a constitutionally intolerable event."); *Id*. at 429 (White, J., concurring) ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case."); *Id*. at 430 (Blackmun, J., joined by JJ. Stevens and Souter, dissenting) ("Nothing could be more contrary to contemporary standards of decency … than to execute a person who is actually innocent."). Even Chief Justice Rehnquist left open whether in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant

unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," 506 U.S. at 417, although "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*

The Ninth Circuit, along with many of its sister circuits, have held that a § 2241 petition is available under the "escape hatch" of § 2255 when a petitioner (1) makes a claim of actual innocence, and (2) has not had an "unobstructed procedural shot" at presenting that claim. *Ivy*, 328 F.3d at 1060; see also *Abdullah v. Hedrick*, 392 F.3d 957, 960 (8th Cir.2004); *Reyes-Requena v. United States*, 243 F.3d 893, 903 (5th Cir.2001); *In re Jones*, 226 F.3d 328, 333-34 (4th Cir.2000); *Wofford v. Scott*, 177 F.3d 1236, 1244 & n. 3 (11th Cir.1999); *In re Davenport*, 147 F.3d 605, 609-11 (7th Cir.1998); *Triestman v. United States*, 124 F.3d 361, 363 (2d Cir.1997); *In re Dorsainvil*, 119 F.3d 245, 251 (3d Cir.1997). These circuits consider these two requirements in reverse order.

The factual basis of Smith's actual innocence claim was unavailable until the recent confession of C.P.A. to friends in Red Bay. Throughout post-conviction proceedings, Smith diligently attempted to develop evidence demonstrating his actual innocence. The Eighth Circuit's position is that the new evidence claimed by the petitioner must not have been available at trial and "could not have been discovered earlier through the exercise of due diligence." *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) (citing *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001)).

### C.P.A. Recantation in 2013

Here, we must determine whether Smith has carried his burden of proving, by clear and convincing evidence, that the victim's recantation of her testimony is "material" and, thus, renders Smith's case so tenuous that, had the recantation been produced at trial, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

In Smith's initial § 2255 Motion, he argued that C.P.A.'s recantation in an affidavit, proved that the victim's previous testimony regarding petitioner's criminal conduct was false, and thus, placed petitioner's conviction into question. However, the Court's opinion reads:

> "While the victim did recant her initial testimony, she subsequently met with FBI Agent Patrick Stokes in person on February 27, 2014 and gave statements in an affidavit that her cousin offered her marijuana and pressured her to make the false recantation. (Doc. 14-2 at 2-3.) Specifically, she stated that her cousin dictated the affidavit and that the statements she wrote on September 27, 2013 are "completely false." (*Id.*) The victim even attempted to get the September 2013 affidavit back, but her cousin claimed not to know its location. (*Id.* at 3.) Not only is the February 2014 affidavit persuasive, but the inculpatory nature of the text messages sent between petitioner and the victim make it highly unlikely that the victim's recantation is truthful.
> As the court finds that the victim's recantation testimony is not credible, this claim is due to be denied."

See CvDoc. 25 at 15-16.

14

Accordingly, where a witness' recantation is used to collaterally attack a conviction, "[t]here must be clear and convincing proof that the witness testified falsely at the trial, and not merely proof that by reason of conflicting statements his testimony is unworthy of belief." *Lewis*, 193 Va. at 626, 70 S.E.2d at 302 (emphasis added). The controlling inquiry, then, is not merely whether the recantation was true, but whether, considering the recantation in light of all the other evidence, the conviction was predicated upon perjured testimony. See *Ortega v. Duncan*, 333 F.3d 102, 104, 107 (2d Cir.2003).

To prove the materiality of the recantation, a petitioner must establish either: (1) that the recantation is true, or (2) if the recantation is not true, that the witness' lack of credibility, when considered along with all the evidence in the case, establishes that the trial testimony was perjured. *Id.*; see also, *Powell v. Commonwealth*, 133 Va. 741, 756, 112 S.E. 657, 661 (1922) (holding that, where a witness recants her trial testimony, a new trial is warranted only if "the court has evidence before it which establishes the perjury or mistake, in such a clear and convincing manner as to leave no room for doubt"). Where the evidence merely proves that the witness made conflicting statements and, therefore, "spoke falsely on one occasion," the recantation is insufficient to justify post-conviction relief because it does not, standing alone, "establish that his testimony at the trial was false and the

statements in the subsequent affidavit were true." *Lewis*, 193 Va. at 626, 70 S.E.2d at 302 (emphasis added).

Thus, for C.P.A.'s recantation to be deemed "material," such that it "would" produce a different result in another trial, Smith must prove, by clear and convincing evidence, that C.P.A. perjured herself at trial. See *Lewis*, 193 Va. at 626, 70 S.E.2d at 302 ("There must be clear and convincing proof that the witness testified falsely at the trial"). Smith may carry his burden of proof either by establishing that the recantation is true, see, e.g., *State v. Eder*, 78 Wash.App. 352, 899 P.2d 810, 811 (1995) ("We hold that recantation testimony, in the form of newly discovered evidence, warrants [post-conviction relief] only if it is material; [and] it is material only if it is true"), or by establishing that C.P.A.'s lack of credibility, when considered along with all of the other evidence in the case, demonstrates that her trial testimony was perjured.

Hence, there was no trial held in this case because Smith's counsel persuaded him that it is best to plead guilty instead of receiving a possible life sentence should he opt to proceed to trial.

**Fact:** Amanda Deaton, a/k/a Amanda Braziell, ("Deaton") told C.P.A. to say and accuse Smith because he would not date her mother. Amanda said if she could not get him [Smith], no one would, and that she was going to see to it that no one

16

could have him. C.P.A. confessed that Deaton was afraid Smith would tell her husband and she would lose everything (this is after Deaton approached Smith and he turned her down). C.P.A. stated that her mother depended on her so they would not lose anything, especially her son. See Exhibit 2.

Now, five (5) years after claiming that she was pressured by Ann Castro to write the recantation affidavit, C.P.A. is still thinking about Smith's case and how her lies got him a 120-month sentence. Numerous people (at least 5) have heard C.P.A. talk about her mother, Amanda Deaton ("Deaton"), who made her lie on Smith, making her upset and sorry that she put an innocent man in prison.See Exhibit 1.

Several years later the child, for various reasons, recants and now says that Smith did not have sex with her at any time. Her position now is that she was pressured by her mother into making the allegation.

**Note:** "Conscience," the sense or consciousness of the moral goodness or blameworthiness of one's own conduct, intentions, or character together with a feeling of obligation to do right or be good.

In this case, C.P.A. has been confessing and confiding her wrongful act of lying on Smith. Her moral sense– acting as a guide, wanting her to right the mistakes she had done on Smith.

17

A confession is evidence that must be considered, therefore, Smith's case should be remanded for resentencing as he is innocent.

How is the judicial system supposed to sort this out? Only two hearts and minds will ever know the absolute truth in this scenario and even that may be dubious. If the truth lies in the human heart, rather than a Petri dish or DNA test result, do we simply declare that the judicial system is incapable or unwilling to address the matter? Because the original trial is, quite appropriately, "the main event," should we forbid any reprise, regardless of the persuasiveness of proof? Is there never a second act to a fundamentally fair first trial when counsel screwed up by advising defendant to plead guilty? It is the purported crime victim who has created the problem by now claiming that she really was not a victim at all. If the original trial afforded all of the required procedural protections, and if the institutional players the prosecutor, the defense attorney, the judge, the jury lived up to their legal, moral, and ethical obligations, the criminal justice system should not wash its hands of this dilemma and say, "Bad luck, it's not our fault. Take your problems elsewhere"?

Instead, this Court should attempt to thread the eye of the needle by making a habeas applicant's free-standing claim of actual innocence cognizable, but only if it is supported by newly discovered evidence that "unquestionably establishes his innocence."

This approach has worked remarkably well when the trial court finds the post-trial recantation not credible and recommends the denial of habeas relief. This Court routinely follows the trial court's factual findings, legal conclusions, and recommendation. Those cases are speedily disposed of with per curiam orders. This approach has not worked so well in those few instances where the trial judge finds that the recantation is credible, the newly discovered evidence unquestionably establishes the inmate's innocence, and he recommends granting relief.

The legal question, which we must review de novo, is different: does this evidence, viewed in the light most favorable to the trial court's factual findings and credibility determinations, actually demonstrate that the person is "unquestionably innocent" of the crime? In answering this question, we should consider the trial court's conclusions of law as well as his recommendation, if any, concerning the grant or denial of habeas relief, but it is nonetheless a legal conclusion that this Court, as the final decisionmaker in habeas applications, must make.

First, then, what legal meaning does the phrase "unquestionably innocent" have? In *Elizondo*, we explained that we borrowed this phrase from the Supreme Court's discussion in *Herrera* and *Schlup*. In fact, that phrase is a shorthand rendition of the Supreme Court's discussion of the distinction between a bare claim of innocence and a claim of innocence coupled with one of constitutional error. The

pertinent sentence from *Schlup* is: "[i]f there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the applicant's] innocence. In Elizondo, the Court explained that the phrase "unquestionably establishes" means "clear and convincing" proof. That is, under *Schlup*, the federal district court judge hearing the habeas application must be convinced that the new evidence does, by itself, unquestionably establish, that is, prove by clear and convincing evidence, the applicant's innocence.

## V. CONCLUSION

For the above and foregoing reasons, Smith's sentence should be vacated for resentencing. In the alternative, an evidentiary hearing should be held so that Smith may further prove his meritorious ground for relief, resolve any disputed facts, and expand an incomplete record.

Respectfully submitted,

Dated: April 3̲0̲, 2019.

*Jerry Smith*

JERRY SMITH
REG. NO. 29176-001
FCI FORREST CITY LOW
FEDERAL CORR. INSTITUTION
P.O. BOX 9000
FORREST CITY, AR  72336
Appearing *Pro Se*

**<u>EXHIBIT 1:</u>**
**"LETTERS"**

I was hanging out in town
with some of my friends
in Red Bay. Cheyenne Ashley
was present. She started talking
about telling lies on Jerry Smith.
She seemed to be very upset
and sorry knowing that she
put an innocent man in
prison.

*Dallas Thorn*

*Jeanece Pearson*
11/14/18

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 112353
JEANECE PEARSON
Commission Expires
May 10, 2019
TISHOMINGO COUNTY

I was walking out of
Church and Cheyenne Ashley
Call out my name And I
turned to her She was Crying
And telling me She was Sorry
for all the lies that had
Been told She Said She was
trying to stop the lies but
Know one are would listen
to her She Also Said I'm
trying to make it right I
turned back around and
walked down the steps
And left

Deborah Walton
11-9-18

Dec 3 2018
ID 110853
KatrinaMcGee

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 110853
KATRINA L. McGEE
Commission Expires
Dec. 3, 2018
TISHOMINGO COUNTY

Cheyenne Ashley & I were eating lunch one day with some of our friends. She started to talk about how her Mother Amanda made her lie on Jerry Smith. And how she hated to do it and wish she could make it right. She said she feels really bad because he went to prison for something he didn't do.

Danielle M Jones

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 112353
JEANECE PEARSON
Commission Expires
May 10, 2019
TISHOMINGO CO.

Jeanece Pearson
11/14/18

To whom it may Concern:

I was attending church on a Sunday and I over heard cheyanne ashley telling a lady she was so sorry for telling lies on her Husband jerry smith she was trying to just make things Right and was so Very sorry.

11-14-18                    Jolly m Dees

Jeanece Pearson
11/14/18

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 112353
JEANECE PEARSON
Commission Expires
May 10, 2019
TISHOMINGO COUNTY

**<u>EXHIBIT 2:</u>**
**"Affidavit of Trisha Johnson"**

I, Trisha Johnson, age 42 have
known Cheyenne Payge Ashley
15 years. She is friends with my
daughter Brittany Nicole Lane.
She has spent the night at my house
numerous times. She and my
daughter became very close friends.
During the time Jerry Wayne Smith
was accused of his crime at which
he has been imprisoned 7 years,
My daughter and I both heard
Cheyenne state Jerry did NOT have
Sex with her at ANY time. Cheyenn=

also stated her mom told her

to say and acouse Jerry because

Jerry would not dat her, and

if She could not have him, no one

would. And that she was

going to see to it that No one

could have him. She stated her

mom was afraid Jerry would

tell her husband and she would

lose everything because she had

approached him and he turned

her down. She stated her mom

depended on her so they didnt

loose anything, esp her son. Then
Amanda Deaton, Cheyennes Mom
told Cheyenne to ask Jerry if
she could go on a truck trip
with him. Amanda then gave
the permission for Cheyenne to go.
Jerry Smith is <u>NOT</u> guilty.

Trisha Johnson
10·30 18

Lynn Maroon, notary
10/30/18

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 55811
LYNN MAROON
Commission Expires
April 26, 2019
TISHOMINGO COUNTY